1   MORGAN, LEWIS & BOCKIUS LLP
Michael L. Banks, *(Pro Hac Vice Forthcoming)*
2   Sarah E. Bouchard, *(Pro Hac Vice Forthcoming)*
1701 Market Street
3   Philadelphia, PA 19103-2921
Tel: 215.963.5000
4   Fax: 215.963.5001
E-mail: mbanks@morganlewis.com
5   E-mail: sbouchard@morganlewis.com

6   LITTLER MENDELSON, P.C.
Rick D. Roskelley, Bar No. 3192
7   3960 Howard Hughes Parkway, Suite 300
Las Vegas, Nevada 89169-5937
8   Tel: 702.862.8800
Fax: 702.862.8811
9   E-mail: rroskelley@littler.com

10   Attorneys for Defendants

11               UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
12

13

14   SPENCER CRANNEY, MITCHELL         Case No. 2:07-CV-01587 RLH-PAL
AMOS, CATHERINE SAMUELSON,
DOUGLAS BROWN, and RICHARD
15   MONIGHETTI et al., on behalf of
themselves and all other employees
16   similarly situated,                 **DEFENDANTS' MEMORANDUM OF**
                                  **POINTS AND AUTHORITIES IN SUPPORT**
17               Plaintiffs,          **OF OPPOSITION TO MOTION FOR**
                                  **COLLECTIVE ACTION NOTIFICATION**
18               vs.

19   CARRIAGE SERVICES, INC.,
CARRIAGE FUNERAL HOLDINGS,
20   INC., CFS FUNERAL SERVICES, INC.,
CARRIAGE HOLDING COMPANY,
21   INC., CARRIAGE MANAGEMENT, L.P.,
CARRIAGE INVESTMENTS, INC.,
22   MELVIN C. PAYNE and LORIE
PARAMETER,
23
               Defendants.
24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

1

**TABLE OF CONTENTS**

2

|  |  | Page |
|---|---|---|

I.    INTRODUCTION ............................................................. 1

II.   RELEVANT FACTUAL & PROCEDURAL BACKGROUND ...................................... 4

    A.    Plaintiffs' Complaint And Instant Motion .............................................. 4

    B.    Carriage Services, Inc .............................................................. 5

        1.    Carriage's Workforce.......................................................... 5

        2.    Carriage's Funeral Home Operations......................................... 6

        3.    The Relevant "Policies" And Practices of Carriage...................... 9

III.  THE LEGAL STANDARD ................................................................. 14

IV.   ARGUMENT ............................................................................ 15

    A.    The Overly Broad And Undefined Scope Of The Proposed Class Makes Clear, On Its Face, That Group-Wide Adjudication Of Plaintiffs' FLSA Claims Would Be Improper. ............................................................. 15

        1.    The Scope Of The Class Is Overly Broad ................................. 15

        2.    The Fundamental Flaw Of Plaintiffs' Motion Is Highlighted By The Fact That All Lead Plaintiffs Are Or Were Employed As Funeral Directors – A Position That Is Largely Exempt From The FLSA's Overtime Provisions................................................................. 17

    B.    Given Carriage's Decentralized Business Model And Philosophy, The Issues Raised Are Too Individualized For Group-Wide Adjudication. ................ 20

        1.    "Off-the-clock" allegations such as those at issue are not appropriate for group-wide adjudication................................... 21

        2.    As with the "off-the-clock" allegations, the individualized and discretionary nature of the incentive bonuses preclude notice and conditional certification regarding Plaintiffs' allegations that Carriage improperly calculated the regular rate of pay........................... 23

V.    CONCLUSION ............................................................................ 25

1

## TABLE OF AUTHORITIES

2   Basco v. Wal-Mart Stores, Inc.,
    Civil Action No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) ...................................... 22
3

    Cameron-Grant v. Maxim Healthcare Servs., Inc.,
4   347 F.3d 1240 (11th Cir. 2003).................................................................................................... 1

5   Cornn v. United Parcel Serv., Inc.,
    No. C03-2001 TEH, 2005 WL 2072091 (N.D. Cal. Aug. 25, 2005)........................................... 22
6

    Diaz v. Electronics Boutique,
7   2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. 2005) ...................................................................... 21

8   Edwards v. City of Long Beach,
    467 F. Supp. 2d 986 (C.D. Cal. 2006)........................................................................................ 15
9

    England v. New Century Fin. Corp.,
10  370 F. Supp. 2d 504 (M.D. La. 2005) ....................................................................................... 22

11  Gerlach v. Wells Fargo & Co.,
    No. C05-0585, 2006 WL 824652 (N.D. Cal. Mar. 28, 2006) .................................................... 20
12

13  Heagney v. European American Bank,
    122 F.R.D. 125 (E.D.N.Y. 1988) ............................................................................................... 16

14  Horne v. United Serv. Auto. Ass'n,
    279 F. Supp. 2d 1231 (M.D. Ala. 2003) .................................................................................... 20
15

16  Lawrence v. City of Philadelphia,
    No. 03-CV-4009, 2004 WL 945139 (E.D. Pa. Apr. 29, 2004) .................................................. 21

17  Leuthold v. Destination Am., Inc.,
    224  F.R.D. 462 (N.D. Cal. 2004)............................................................................................... 15
18

19  Mershon v. Elastic Stop Nat'l Div. of Harvard Indus.,
    No. 87-1319, 1990 WL 484152 (D.N.J. Mar. 23, 1990)............................................................ 16

20  Ray v. Motel 6 Operating Ltd. Partnership,
    No. 3-95-828, 1996 WL 938231 (D. Minn. Mar. 18, 1996) ...................................................... 21
21

22  Rutlin v. Prime Succession, Inc.,
    220 F.3d 737 (6th Cir. 2000)...................................................................................................... 19

23  Scholtisek v. Eldre Corp.,
    229 F.R.D. 381 (W.D.N.Y. 2005) .............................................................................................. 20
24

25  Sheffield v. Orius Corp.,
    211 F.R.D. 411 (D. Or. 2002) .................................................................................................... 21

26  Szarnych v. Theis-Gorski Funeral Home, Inc.,
    No. 97-3069, 1998 WL 382891 (7th Cir. June 4, 1998) ............................................................ 18
27

28  Thiessen v. GE,
    267 F.3d 1095 (10th Cir. 2001)................................................................................................... 20

West v. Border Foods, Inc.,
No. 05-2525, 2006 WL 1892527 (D. Minn. June 12, 2006)............................................ 15, 21

Williams v. Trendwest Resorts, Inc.,
No. CVS05-0605, 2006 WL 3690686 (D. Nev. 2006) ............................................................. 16

**STATUTES**

29 C.F.R. § 541.201-03 ...................................................................................................... 2, 19

29 C.F.R. § 541.301 ................................................................................................................. 17

29 C.F.R. § 778.211 ................................................................................................................. 24

29 U.S.C. § 207(e)(3) ............................................................................................................... 24

29 U.S.C. § 216(b) ............................................................................................................... 1, 15

29 U.S.C. § 251(a) ..................................................................................................................... 1

**MISCELLANEOUS**

93 Cong. Rec. 2182 (1947) ........................................................................................................ 1

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   **INTRODUCTION**

Plaintiffs' Motion for Collective Action Notification is, on its face, the antithesis of what Congress intended when it amended the Fair Labor Standards Act ("FLSA") to allow a court to issue notice to "similarly situated" employees and to certify a collective action.  29 U.S.C. § 216(b).  The significance of the notice and certification procedures cannot be overstated. Congress specifically provided these procedural checks as a way to prevent "financial ruin of many employers" and the burdening of the courts "with excessive and needless litigation." Portal-to-Portal Act of 1947 § 1(a)(1), (7), codified at 29 U.S.C. §§ 251(a)(1), (7).  It is the "opt-in" requirement and the requisite "similarly situated" analysis that assure both the Court and the defendant that the group-wide litigation being brought is, in fact, being brought on behalf of employees who have a real interest in, stake in, and knowledge of the issues being raised in the lawsuit.  See, e.g., Cameron-Grant v. Maxim Healthcare Servs., Inc., 347 F.3d 1240, 1248 (11th Cir. 2003); see also 93 Cong. Rec. 2182 (1947) (Senator Donnell, Chairman of the Senate Judiciary Committee, speaking of the necessity of the opt-in device:  "It is certainly unwholesome to allow an individual to come into court alleging that he is suing on behalf of 10,000 persons and actually not have a solitary person behind him, and then later on have 10,000 men join the suit, which was not brought in good faith, was not brought by a party in interest, and was not brought with the actual consent or agency of the individuals for whom an ostensible plaintiff filed the suit.").

/ / /
/ / /
/ / /
/ / /

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

1

Plaintiffs – one current and four former disgruntled Funeral Directors, all paid on a salary basis[1] – allege that they were not paid for all of the overtime hours that they worked and that their managers failed to follow a host of different federal and state wage and hour laws. Notwithstanding the fact that Funeral Directors are, in most cases, *exempt* entirely from federal overtime regulations,[2] they are asking this Court to authorize notice to, and conditionally certify a class of, practically *every* current and former salaried and hourly employee of Carriage Services, Inc. ("Carriage"). See Plaintiffs' Memorandum (Docket No. 2), at pp. 2-3 (referring only to "current and former hourly employees" as members of putative collective action, notwithstanding fact that named Plaintiffs are paid on salary basis). Carriage currently employs approximately 1,500 non-managerial employees in more than 100 different positions in twenty-six different states at more than 170 locations, where day-to-day operations are run with very little corporate oversight. Of those non-managerial employees, more than 50% are actually part-time employees who have no stake in an action seeking extra pay pursuant to a statutory provision that applies only to employees who work more than forty hours per week. Others within the group that Plaintiffs seek to represent (including their fellow Funeral Directors) are properly classified as "exempt" from the overtime provisions of the FLSA, and similarly have no interest in this litigation. In short, Plaintiffs simply cannot establish that they and the putative "class" are "similarly situated" under the FLSA.

---

[1]    Each named Plaintiff states in his or her Declaration that he or she was an "hourly" employee but, in fact, each was a **salaried** employee who was paid on a fluctuating workweek basis. See Declaration of Lorie J. Parmeter, dated January 28, 2008, ¶ 3 ("Parmeter ¶ 3"), a copy of which is attached as Exhibit A. Indeed, it is evident from the face of the Exhibits attached to Plaintiffs' Memorandum in Support of the Motion for Conditional Certification Notice that Plaintiffs knew they were paid a salary pursuant to a fluctuating workweek plan. See Docket No. 2, Exs. B, C, and D.

[2]    As set forth in more detail in Section IV.A.2, Funeral Directors have been deemed to be exempt under the professional exemption to the FLSA by both the Department of Labor and the only two appellate courts that have addressed the issue. In addition, Funeral Directors satisfy the standards for the administrative exemption under the applicable FLSA regulations. Specifically, these regulations apply where (as here), the employees (1) are paid on a salary basis; (2) have a primary duty of non-manual work directly related to the employer's business; and (3) exercise discretion and independent judgment in the exercise of their duties. See 29 C.F.R. § 541.201-03.

For additional reasons that should be clear from the very limited record compiled to date, this case is poorly suited for collective action treatment. The FLSA issues that Plaintiffs raise focus on: (1) alleged "off-the-clock" work for community service, on-call duties, and pre-need appointments; and (2) the inclusion of certain incentive bonuses in the calculation of the regular rate for overtime purposes – necessarily require highly individualized analyses that cannot be performed on a group-wide basis for differently situated employees in far-flung locations who work under unique circumstances. For each of these claims, Plaintiffs have offered absolutely nothing beyond the same repetitive and wholly unsubstantiated assertions. Such generic declarations certainly do not demonstrate a common, *national* practice of "suffering and permitting" any employees, including Funeral Directors, to work off-the-clock at any time or any common, *national* practice of improperly calculating the regular rate of pay for overtime purposes. By contrast, even if the Court were to accept as true that the named Plaintiffs' *individual* experiences are described accurately in their declarations, the overwhelming evidence offered by Defendants in their opposition demonstrates that Carriage's practices with respect to community service, on-call work, pre-need appointments, and incentive bonuses vary from location to location, and even person to person.

Carriage runs its business as a highly decentralized operation. Since its inception, its focus has been to grow through acquisitions of largely family-owned businesses. These businesses, though part of a larger corporate umbrella, function autonomously. Plaintiffs' self-serving and unsubstantiated suggestions that Carriage exercised significant "centralized control" simply are not true. That a Funeral Director in Las Vegas allegedly was treated one way has absolutely no bearing on how a Funeral Director (let alone a Funeral Assistant or Maintenance worker) was treated in Iowa or New Jersey or Florida. Plaintiffs simply have not made the necessary showing that all "hourly" employees, as well as the salaried employees swept into the class are "similarly

1   situated."

2   **II.      RELEVANT FACTUAL & PROCEDURAL BACKGROUND**

3       **A.      Plaintiffs' Complaint And Instant Motion**

4           On November 28, 2007, one current and four former Funeral Directors filed a Class

5   Action Complaint alleging that Carriage failed to record properly the time worked by employees

6   and, therefore, failed to compensate its employees in a lawful manner.  At the same time,

7   Plaintiffs also filed a Motion for Collective Action Notification, seeking to represent a collective

8   group of "current and former employees of [Carriage] who were suffered or permitted to work

9   time for which they were not compensated, including time for which premium pay was owed but

10  not paid."  Complaint ¶ 11; see also Complaint ¶ 19 ("plaintiffs are employees and former

11  employees of [Carriage] who were suffered or permitted to work by [Carriage] and not paid their

12  regular or statutorily required rate of pay for all hours worked").  Plaintiffs offer nothing more

13  specific in their moving papers, referring only to "current and former hourly employees" as

14  members of the putative collective action.  Plaintiffs' Memorandum (Docket No. 2), at pp. 2-3.

15          To date, 88 individuals have submitted "opt-in" notices, indicating their purported desire

16  to become a part of a collective action under the FLSA.  These opt-in forms merely indicate a

17  consent to join in the case; they do not indicate any factual basis for the claims.  For at least

18  fifteen of those opt-in Plaintiffs, Carriage has no employment records whatsoever (Parmeter ¶ 7),

19  which raises real issues concerning the manner in which these individuals were solicited to join in

20  the case.  For those employees as to whom Carriage has confirmed employment, the positions

21  held vary widely, and include Funeral Directors, Training Specialists, Family Service

22  Representatives, Funeral Assistants, Maintenance employees, and even Apprentice Funeral

23  Directors.  Parmeter ¶ 7.  The duties of these different job classifications differ considerably.

24          The instant Motion seeks to send out notice to several thousand current and former

25  employees, inviting them to join the case, and to certify a class of employees who would then

26  press a multitude of varying grievances, including claims for:  (1) uncompensated, "off-the-

27  clock" time allegedly spent performing undefined community service activities; (2) on-call work,

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

1    i.e., work performed by employees on stand-by to deal with unanticipated and urgent matters

2    outside of the normal work day; (3) pre-need appointments, which consist of meetings with

3    families or individuals to discuss a non-urgent or imminent need for funeral services; and (4) the

4    alleged failure to include individual incentive bonuses in the regular rate of pay that is used to

5    calculate the amounts to be paid to employees for overtime worked.  Plaintiffs make no effort to

6    define the extent to which they or the approximately 83 other opt-ins actually spent such "off-the-

7    clock" time on community service, on-call time, or pre-need appointments, nor do they delineate

8    the extent of their purported "off-the-clock" work or their individualized bonuses.  More

9    importantly, they fail to explain how any failure to pay them for time worked or failure to

10   properly calculate their regular rate of pay flowed from a national practice or policy, as opposed

11   to purely localized decisions by management at any of the three different funeral homes where

12   they worked.

13          **B.      Carriage Services, Inc.**

14                  **1.      Carriage's Workforce**

15          Carriage, a leading provider of death care services in the United States, is headquartered

16   in Houston, Texas and does business in twenty-six states, currently employing more than 1,700

17   individuals nationwide.[3]  Parmeter ¶¶ 4, 5.  Of these 1,700 employees, more than 1,500 are non-

18   managerial employees, and over half of the non-managerial employees work on a part-time basis

19   (fewer than 35 hours per week).[4]  Parmeter ¶ 5.  Save for approximately 105 corporate

20   employees, Carriage's entire workforce is scattered throughout the nation at individual funeral

21   homes and/or cemeteries.  Parmeter ¶ 6.  At present, Carriage owns and/or operates 170 funeral

22   homes in the following states: California; Connecticut; Florida; Georgia; Idaho; Illinois; Iowa;

23   Kansas; Kentucky; Maryland; Massachusetts; Michigan; Missouri; Montana; Nevada; New

24   Jersey; .New Mexico; New York; North Carolina; Ohio; Oklahoma; Rhode Island; Tennessee;

25

26   [3]      Defendants have moved to transfer this case to the United States District Court for the Southern District of
            Texas, where the company is based, where the relevant documents are located, where the employee benefit
27          plans are located, where the individual defendants reside, and where the greatest concentration of witnesses
            live and work.  As of the filing of this brief, that Motion is still pending.

28   [4]      To date, nineteen of the eighty-five putative opt-ins are part-time employees.  (Parmeter ¶ 5.)

1    Texas; Virginia; Washington; and West Virginia.  Parmeter ¶ 4.  Carriage also operates thirty-

2    seven cemeteries.  Parmeter ¶ 4.

3                 **2.**      **Carriage's Funeral Home Operations**

4          The Carriage business model is premised on growth through the acquisition of successful

5    existing family-owned death care service providers.  In furtherance of that model, the Company is

6    highly decentralized and relies on local Managing Partners (who are sometimes former owners)

7    for day-to-day oversight of individual funeral homes and cemeteries.  Parmeter ¶ 8; Declaration

8    of Jay Dodds, dated January 25, 2008, ¶ 5 ("Dodds ¶ __"), a copy of which is attached as Exhibit

9    B; Declaration of Curt Demrow, dated January 25, 2008 ¶¶ 2, 4 ("Demrow ¶ __"), a copy of

10    which is attached as Exhibit C; Declaration of Darren Diebold, dated January 25, 2008, ¶¶ 5, 12

11    ("Diebold ¶ __"), a copy of which is attached as Exhibit D; Declaration of Ron Duhaime, dated

12    January 25, 2008, ¶¶ 3-7 ("Duhaime ¶ __"), a copy of which is attached as Exhibit E; Declaration

13    of Loren Forastiere, dated January 25, 2008, ¶¶ 2-7 ("Forastiere ¶ __"), a copy of which is

14    attached as Exhibit F;  Declaration of Dan Lang, dated January 15, 2008, ¶ 3 ("Lang ¶ __"), a

15    copy of which is attached as Exhibit G; Declaration of Mitch Rose, dated January 24, 2008, ¶ 13

16    ("Rose ¶ __"), a copy of which is attached as Exhibit H; Declaration of Jerry Tilton, dated

17    January 24, 2008, ¶¶ 4-5, 7 ("Tilton ¶ __"), a copy of which is attached as Exhibit I; Declaration

18    of David Wolf, dated January 24, 2008, ¶ 14 ("Wolf ¶ __"), a copy of which is attached as

19    Exhibit J; Declaration of Chad Woody, dated January 25, 2008, ¶¶ 3, 6, 10 ("Woody ¶ __"), a

20    copy of which is attached as Exhibit K.  Many of the families who have sold their businesses to

21    Carriage remain employed primarily because Carriage respects their individual roles and

22    contributions, and has permitted them to continue to run their businesses with autonomy.  <u>See</u>

23    Forastiere ¶¶ 4, 6 (explaining how Carriage is a "resource" to her family's business and how they

24    have recognized Forastiere's "entrepreneurial spirit"); Duhaime ¶¶ 6-7 ("Another reason that I

25    chose Carriage to partner with was because they made clear it was a "hands-off" type of

26    organization, . . . allow[ing] me to maintain a "hands-off" local operation"); Demrow ¶ 4 (same);

27    Woody ¶¶ 6, 10 (same); Declaration of Doug Sidun, dated January 25, 2008, ¶ 5 ("D. Sidun Dec.

28    ¶ __"), a copy of which is attached as Exhibit U; <u>see also</u> Tilton ¶ 3 (explaining his decision to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

1   return to the death care services industry in part because Carriage "respect[s] how important the

2   front-line people are. They understand that it is the people on the ground, in the funeral home

3   who know how the business should be run.")

4           Of course, Carriage does oversee the localized operations to an extent, but mostly with

5   regard to bottom-line financial performance. It utilizes only three Regional Partners to conduct

6   that oversight, and relies extensively on Managing Partners in each of the local operations to run

7   the day-to-day operations. Dodds ¶ 4. The localized Managing Partners are assessed primarily

8   on their performance, as reflected by profitability metrics, and they determine how frequently to

9   interact with the Regional Partners. Demrow ¶ 16; Diebold ¶¶ 12, 14; Forastiere ¶ 9; Tilton ¶ 5.

10  In some locations, Managing Partners will not reach out to Carriage except for items such as

11  major capital expenditures or in emergencies. See Duhaime ¶¶ 14-15; Wolf ¶ 15; Woody ¶ 10.

12          Localized Managing Partners, in turn, rely on Funeral Directors (such as the named

13  Plaintiffs) to prepare for and conduct the funerals and otherwise meet the needs of the families

14  that are Carriage's customers. Depending on location, some Funeral Directors refer to themselves

15  as "Funeral Arrangers" or "Funeral Coordinators." See Declaration of Shannon Nordyke, dated

16  January 17, 2008, at ¶ 3 ("Nordyke ¶ __"), a copy of which is attached as Exhibit S. The number

17  of funerals handled at each individual location varies widely, ranging from 900 funerals per year

18  in Las Vegas, Nevada (Lang ¶ 7), to approximately 525 funerals and 450 internments in Panama

19  City, Florida (Rose ¶ 7), to as few as 300 funerals per year in Bristol, Connecticut (Duhaime ¶ 5),

20  to 100 in El Dorado, Kansas (Declaration of Dale Dawson, dated January 25, 2008, ¶ 5 ("Dawson

21  ¶ ___"), a copy of which is attached as Exhibit L). The nature of the business – and, therefore,

22  the nature of the duties of the Funeral Directors – is dictated almost entirely by the needs of

23  particular families and of the community. Demrow ¶ 8; Duhaime ¶ 10; Tilton ¶ 8; Woody ¶ 8.

24  As a result, the demographics of the location in which a Funeral Director is employed will impact

25  how the work is performed. For example, in Las Vegas, "the diversity of the surrounding area

26  makes each funeral different," (Lang ¶ 5), whereas in Iowa, the community is much less diverse

27  and, therefore, there is somewhat more uniform in the services provided (Nordyke ¶ 4). See also

28  Diebold ¶ 6 (explaining how the responsibilities of Funeral Directors are different at his location

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

7

1   because his funeral homes are smaller. In addition, some locations have connections to the

2   county coroners and, therefore, the scope of the duties, hours worked, and even the nature of the

3   work performed there can be significantly different. See Lang ¶ 8; Demrow ¶ 9. At other

4   locations, Carriage is permitted by law to operate cemeteries that it owns, and certain Funeral

5   Directors have dual responsibilities for these different kinds of operations. See Lang ¶ 3; Rose ¶¶

6   2, 7; Wolf ¶¶ 1, 5.

7        Regardless of the location, however, the Funeral Director's independent judgment and

8   discretion ultimately leads to Carriage's operational success. As dictated by the demands and

9   needs of the families/customers, Funeral Directors must be flexible and responsive, and able to go

10   where they are needed on very short notice. Demrow ¶¶ 7, 8; Diebold ¶ 13; Rose ¶ 10; Tilton ¶

11   12; Wolf ¶ 12; Declaration of Michael Gadziala, dated January 25, 2008, ¶¶ 6-8 ("Gadziala ¶

12   ___"), a copy of which is attached as Exhibit M; Declaration of Brian Kastner, dated January 25,

13   2008, ¶ 6 ("Kastner ¶ ___"), a copy of which is attached as Exhibit Q. They must instinctively

14   know how to respond to family preferences and demands, and must be flexible and

15   compassionate in meeting with grieving families, gathering highly personal information in the

16   most difficult circumstances, and then shepherding that family through the process (whether with

17   a viewing, a cremation, or a funeral service). There is no script, nor can there be, given the nature

18   of the business. Demrow ¶ 8; Diebold ¶ 13; Duhaime ¶ 10; Forastiere ¶ 21; Lang ¶ 5; Tilton ¶ 12;

19   Wolf ¶ 12; Dawson ¶ 13; Gadziala ¶¶ 6-8; Declaration of Jason Thompson, dated January 25,

20   2008, at ¶ 7 ("Thompson ¶ ___"), a copy of which is attached as Exhibit W; Declaration of

21   Danielle Wilk, dated January 24 2008, ¶ 6 ("Wilk ¶ ___"), a copy of which is attached as Exhibit

22   X; Declaration of Shane Young, dated January ___, 2008, ¶ 13 ("Young ¶ ___"), a copy of which is

23   attached as Exhibit Y.

24        Other responsibilities are dictated entirely by location and the philosophies of the

25   localized Managing Partners, or even by the individual Funeral Directors. For example, in Red

26   Bank, New Jersey, the Managing Partner has chosen to employ a strong support staff and outside

27   third-party services who handle more administrative duties, such as drafting obituaries and

28   transferring bodies to the funeral homes. Tilton ¶ 7. In Escalon, California, only one Funeral

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

8

Director does any night-transports of bodies, and it is his decision whether to do so or whether to contact a third-party service.  Diebold ¶ 9.  Some Funeral Directors prefer to embalm more than to interact with families, whereas other Funeral Directors rarely embalm.  <u>Compare</u> Declaration of Dave Julius, dated January 18, 2008, at ¶ 6 ("Julius ¶ __"), a copy of which is attached as Exhibit P, <u>with</u> Tilton ¶ __.  <u>See</u> <u>also</u> Duhaime ¶ 9; Rose ¶ 12; Wolf ¶ 6.  In other locations, the Funeral Directors have responsibility for their professional duties and also for drafting obituaries, filing death certificates, overseeing the execution of contracts with the families, and transferring bodies.  Woody ¶ 8; Gadziala ¶¶ 10, 13; Declaration of Dan Shaeffer, dated January 24, 2008, ¶¶ 4-5 ("Schaeffer ¶ ___"), a copy of which is attached as Exhibit T.

Still other differences exist.  In Las Vegas, Nevada, at least one Funeral Director is primarily responsible for "ship outs" of deceased to Mexico whose family members and next of kin are out-of-country.  <u>See</u> Declaration of George Herrera, dated January 18, 2008, ¶ 6 ("Herrera ¶ __"), a copy of which is attached as Exhibit N.  In other locations, there are full-time pre-need employees and, therefore, the Funeral Directors do not have any responsibility for pre-needs and in other locations, Funeral Directors are not licensed to sell pre-need policies and, therefore, do not do so at all.  Dawson ¶ 9; Shaeffer ¶ 8; D. Sidun ¶ 15; Declaration of Ted Sidun, dated January 25, 2008, ¶ 12 ("T. Sidun ¶ ___"), a copy of which is attached as Exhibit V; Thompson ¶ 15.  In contrast, only one Funeral Director in Las Vegas sells the "pre-need" policies at issue in this litigation – that person is one of the named Plaintiffs, Spencer Cranney.  In short, the job duties, the day-to-day activities, and the hours worked of Funeral Directors are highly individualized, and vary based on geographic location, managing partner, as well as the preferences of each family that Carriage services.

### 3.   The Relevant "Policies" And Practices of Carriage

Throughout the Complaint and Motion for Collective Action Notification, as well as in the Declarations submitted by Plaintiffs, there are numerous references to Carriage's "Community Work Policy," "On Call Pay Policy," "Pre-Needs Appointment Policy," and "Calculation of Additional Remuneration Policy."  <u>See</u> Complaint (Docket No. 1) ¶ 48; Plaintiffs' Memorandum (Docket No. 2) at pp. 3-8, 18-22.  In fact, however, <u>no</u> such polices exist.  Parmeter ¶ 9.  To the

1    contrary, Carriage's handbook includes a "Timekeeping Procedures" provision, which

2    specifically instructs that "[a]ll employees are required to maintain a time record," and that:

3          All time worked must be recorded. ***"Working off the clock" is***
           ***strictly prohibited and may not be authorized by the Managing***
4          ***Partner or any other supervisor.*** If this occurs, please notify your
           Regional Partner or the Human Resources Department. You may
5          do this confidentially by using My Safe Workplace.

6    Parmeter ¶ 10, Exhibit 1 (emphasis added). Carriage's handbook also includes an "Overtime Pay

7    Practices" provision in which the Company confirms that "All ***hourly non-exempt employees*** are

8    entitled to overtime pay for all hours worked in excess of forty (40) hours in each workweek,"

9    subject to differences in applicable state law. Parmeter ¶ 11, Exhibit 2.

10                              ***Hours Worked by Funeral Directors***

11         As set forth above, the specific responsibilities of Funeral Directors vary from location-to-

12   location, by manager-to-manager, and even from day-to-day, depending on the needs of the

13   business and the families. Although Funeral Directors generally work at the funeral home or

14   cemetery during the day, during those hours, if a Funeral Director is not attending to the needs of

15   a family, he or she is free to run personal errands, read the newspaper, attend Rotary and Kiwanis

16   meetings, meet with local clergy, or even "day trade" stocks, without "punching out." Demrow

17   ¶¶ 7, 11; Diebold ¶ 11; Tilton ¶ 18; Herrera ¶ 11; D. Sidun ¶ 12; Young ¶ 17. In other words,

18   Funeral Directors often have the flexibility to conduct significant non-company business on

19   company time.

20         Because of the fluctuating nature of the business, a Funeral Director may have to work

21   outside of regularly scheduled hours as the need arises. In recognition of this commitment,

22   Funeral Directors generally are paid on a fixed salary, but also receive overtime compensation, as

23   well. Parmeter ¶ 3 (as to all named Plaintiffs); Dawson ¶ 4; Gadiziala ¶ 2; Nordike ¶ 6; Shaeffer

24   ¶ 3; D. Sidun ¶ 6; Thompson ¶ 5; Wild ¶ 7. At certain locations, some Managing Partners

25   exercise their considerable discretion to pay additional incentive compensation to Funeral

26   Directors. Compare Lang ¶ 15; Tilton ¶ 19; Wolf ¶ 13; Shaeffre ¶ 10 with Demrow ¶ 17;

27   Forestiere ¶ 17; Rose ¶15; Dawson ¶ 14; Thompson ¶ 12; Young ¶ 16. In addition, certain

28   Managing Partners will pay for tickets, fees or dues to various organizations and events. Demrow

1  ¶ 12; Diebold ¶ 11; Forestiere ¶ 18; Rose ¶ 14; Woody ¶ 13; Dawson ¶ 10; Herrera ¶ 9;

2  Declaration of Richard Magdycz, dated January 25, 2008, ¶ 4 ("Magdycz ¶ __"), a copy of which

3  is attached as Exhibit R; D. Sidun ¶ 12; Wild ¶ 14.

4       As a general matter, all employees (including Funeral Directors) "clock in" at fingerprint

5  time clocks located somewhere within their individual funeral homes.  Dawson ¶ 7; Declaration

6  of Mark Hopkins, dated January 18, 2008, ¶ 7, ("Hopkins ¶ ___"), a copy of which is attached as

7  Exhibit O; Julius ¶ 8; Shaeffer ¶ 4; Thompson ¶ 10; Wolf ¶ 8; Young ¶ 9.  In some locations,

8  Funeral Directors begin their day at a "hub" location, and "clock-in" at that location instead.  <u>See</u>

9  Tilton ¶ 9.  When employees are unable to "clock in" – either because they are driving directly to

10  an appointment or a service from their home, because of a problem with the clock, or simply

11  because they forget – the Managing Partners must find their own ways to deal with the missed

12  time recordings to ensure that employees are paid properly.  Dodds ¶¶ 11-14.  For example, many

13  Managing Partners have created written "Missed Punch Logs," or some other written form by

14  which employees (including Funeral Directors) can record their time worked and submit that time

15  to the Managing Partner or to another office employee.  Demrow ¶ 14; Diebold ¶ 10; Rose ¶ 8;

16  Tilton ¶¶ 9-10; Wolf ¶ 9; Forestiere ¶ 14; Declaration of Joe Donnelly, dated January 17, 2008, ¶

17  4 ("Donnelly ¶ __"), a copy of which is attached as Exhibit Z.  Other Managing Partners discuss

18  time issues with employees and, if necessary, adjust the time directly in Carriage's computer

19  system.  <u>See, e.g.</u>, Duhene ¶ 12; Lang ¶ 16; Woody ¶ 12, Dawson ¶ 7; Thompson ¶ 10; Wilk ¶ 11.

20  Therefore, if a Funeral Director works after-hours either due to a late-night pre-need appointment,

21  removal of a body, or other work-related reason, each Carriage location has its own practices in

22  place to ensure that all time worked is recorded.  As explained by one Managing Partner, it is his

23  and Carriage's policy that "no one works for free."  Tilton ¶ 9; <u>see also</u> Forestiere ¶ 15; Lang ¶

24  16; Woody ¶ 11 ("the policy here at Watson-King is that if you are working, you are on the

25  clock"); D. Sidun ¶ 7; Magaycz ¶ 8; Dawson ¶ 8 (explaining that he has never been told not to

26  account for all time worked nor has he ever had a problem with being created for all time

27  worked); Gadziala ¶ 15 (same); Herrera ¶ 10 (same); Hopkins ¶¶ 9-10 (same); Julius ¶¶ 13-14

28  (same); Kastner ¶ 10 (same); Nordyke ¶¶ 8-9 (same); Shaeffer ¶ 6 (same); T. Sidun ¶8 (same).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### On-Call Time

Due to the nature of the business, the Managing Partners, the staff, and the Funeral Directors employed by Carriage may be scheduled for occasional "on call" time.  Dodds ¶ 10 Demrow ¶ 7 ("The nature of the beast is that a Funeral Director must be available all hours of every day, including holidays.") Forestiere ¶ 12; Wolf ¶ 12 (explaining that, as a licensed Funeral Director now employed as a Managing Partner, "Yes, we are open 365 days a year and it is a 24-hour business, but the upside is that there is so much freedom."); Gadziala ¶ 6 ("I enjoy my profession because I like the community, the freedom, and I like being busy.  Sometimes the nature of the business requires long hours, but I don't mind because I enjoy serving families."); Nordike ¶ 6; D. Sidun ¶ 9.  For those Funeral Directors who agree to be scheduled for on call time, the Managing Partner decides how to allocate "on call" responsibility.  For example, in Springfield, Massachusetts, full-time and part-time Funeral Directors are required to be "on call" one night per workweek and one night every three weekends.  See Forestiere ¶ 12; Gadziala ¶ 14.  In Escalon, California, the "on call" schedule essentially is up to the Funeral Directors.  Diebold ¶¶ 6-7.  Regardless of the schedule, being "on call" does not require any employee, including a Funeral Director, to sit at the funeral home throughout the call period.  Gadziala ¶ 14.  Rather, "on call" employees simply must be available to remove the deceased, as necessary, should immediate action be necessary.  Dodds ¶ 10.  See also Gadziala ¶ 14; Kastner ¶8; Shaeffer ¶ 5.  Typically, the time required to remove a body is less than two hours.  Dawson ¶ 5; D. Sidun ¶ 9.  All employees, including Funeral Directors have been instructed to either "clock in" and "clock out" or otherwise record all time spent (if any) while on call.  Dawson ¶ 6; Gadziala ¶ 14; Katner ¶ 9; Magdycz ¶ 6; D. Sidun ¶ 9; Thompson ¶ 9; Young ¶ 9.

### Pre-Need Appointments

Some, but not all, Carriage funeral homes employ a "Pre-Need Counselor."  In this role, an employee markets to and meets with individuals in the community to create a death services plan with Carriage before the need for such services arises.  Dodds ¶ 17.  In some locations, these employees manage their own schedules, and are paid exclusively on commission.  Dodds ¶ 17.  Very few Funeral Directors are required to conduct pre-need appointments outside of the regular

1    business day. Dodds ¶ 17. However, to the extent that a Funeral Director (or any other

2    employee) conducts such an appointment, whether during regular working hours or otherwise,

3    Carriage and its Managing Partners expect that all such time will be compensated. Dodds ¶ 17;

4    Parmeter ¶ 13.

5                            ***Community Service***

6            The concept of uncompensated "community work" or "community service" is not a

7    "policy" of Carriage. Parmeter ¶ 9; Dodds ¶ 8; Demrow ¶ 11; Forestiere ¶ 18; Tilton ¶ 16; Wolf ¶

8    11; Woody ¶ 13; Dawson ¶ 10; Gadziala ¶ 11; Herrera ¶ 9; Hopkins ¶ 11; Julius ¶ 15; Kaster ¶ 7;

9    Magdycz ¶ 4; D. Sidun ¶ 12; T. Sidun ¶ 11; Thompson ¶ 13; Wilk ¶ 14; Young ¶ 17. First, the

10   types of community service in which Funeral Directors are involved are hardly services for which

11   an employer should be responsible. Most notably, many Funeral Directors view their church

12   activities to be "community service" that relates to their work. See Nordyke ¶ 10 (explaining

13   how her personal decision to join and attend a local church has resulted in business for Carriage,

14   describing the referrals as "a nice added benefit to going to church – something I believe I should

15   be doing anyway!"); Shaeffer ¶ 11 (explaining how his and his wife's involvement in their church

16   relates to his work as a Funeral Director but acknowledging that Carriage "is not why I am

17   involved in church"). Other Funeral Directors participate in additional activities that have

18   personal meaning to them, including the Kiwanis and the VFW, and which they would be doing

19   even if they were not employed by Carriage. Dawson ¶ 10; Hopkins ¶ 11; Kastner ¶ 7; Magdycz

20   ¶ 4; Shaeffer ¶ 11; D. Sidun ¶ 12; T. Sidun ¶ 11; Wilk ¶ 14.

21          Further, community service is just a part of the death care services industry. It is a

22   business built on relationships and on trust, and one way to build those critical relationships

23   happens to be through the same community services that the Funeral Directors and Managing

24   Partners would participate in regardless of their profession. Dodds ¶ 8; Demrow ¶ 11; see also

25   Wolf ¶ 11 (explaining that his Funeral Directors use community service as a way to "find their

26   passion" so that they are happy and fulfilled employees). Indeed, at some Carriage locations,

27   community service is not even discussed because certain individuals (usually former owners)

28   already have established a presence in the community. See, e.g., Rose ¶ 14; Duhaime ¶ 13; see

1    also Julius ¶ 15 (explaining how he chooses not to be involved in any community service);

2    Thompson ¶ 13 (explaining how he is not interested in "traditional" Community Service and opts

3    for events for which he is compensated).  At most, community service is encouraged by

4    Managing Partners (and recognized by Funeral Directors) as "soft-skill" that Funeral Directors

5    should consider in terms of their professional development.  See Demrow ¶ 11 (a "no brainer" in

6    the profession); Lang ¶ 18 ("good idea for any professional").  In the few locations at which

7    Managing Partners have hosted community service events, employee attendance either is not

8    mandatory (Forastiere ¶ 18) (sponsoring "one large-scale community outreach sent per year), or

9    the employees are paid for their work at those events (Woody ¶ 15) (calling bingo once per month

10   at a senior center); Diebold ¶ 11 (attending "morning coffee" sponsored by the Chamber of

11   Commerce.

12          ***Individual Incentive Bonuses***

13          Plaintiffs suggest that bonuses were not included in the determination of the regular rate

14   and, therefore, that overtime calculations were improper under the FLSA.  However, other than

15   the discretionary performance-based quarterly "EIS" bonuses for which Funeral Director may be

16   eligible, all other bonuses vary by region and by Managing Partner.  Parmeter ¶ 12; Dodds ¶9.

17   Some Managing Partners choose to incent Funeral Directors and other staff members through

18   individual discretionary bonuses, such as "flower bonuses," "monument bonuses," or even

19   embalming incentives.  Donley ¶ 5; Demrow ¶ 17; Duhaime ¶ 16; Tilton ¶ 19; Wolf ¶ 13.  In

20   some locations, Funeral Directors are able to arrange for their own bonuses with local service

21   providers.  Shaeffer ¶ 10.  In other locations, the Managing Partners exercise their significant

22   discretion ***not*** to offer any individual incentive bonuses.  Diebold ¶ 14; Forestiere ¶ 17; Rose ¶ 15;

23   Woody ¶ 9; Dawson ¶ 14; Thompson ¶ 12; Young ¶ 16.

24   III.    **THE LEGAL STANDARD**

25          Before a district court can conditionally certify an FLSA collective action and authorize

26   notice to be sent to the members of such a group, the plaintiffs must demonstrate that they are

27   "similarly situated" to the potential collective action members.  29 U.S.C. § 216(b) (stating that

28   "an action [for relief under the FLSA] may be maintained . . . by any one or more employees for

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

14

1   and on behalf of . . . other employees similarly situated"); <u>Leuthold v. Destination Am., Inc.,</u> 224

2   F.R.D. 462, 466 (N.D. Cal. 2004) ("To certify a FLSA collective action, the court must evaluate

3   whether the proposed lead plaintiffs and the proposed collective action group are 'similarly

4   situated' for purposes of § 216(b).  Plaintiffs bear the burden of making this showing.").  To meet

5   this burden, plaintiffs cannot rely on "unsupported assertions of widespread violations." <u>Edwards</u>

6   <u>v. City of Long Beach</u>, 467 F. Supp.2d 986, 990 (C.D. Cal. 2006).  Stated another way, "before

7   subjecting an employer to the burdens of a collective action, the plaintiffs must establish a

8   colorable basis for their claim that a [ ] class of 'similarly situated' plaintiffs exist." <u>West v.</u>

9   <u>Border Foods, Inc.,</u> 2006 WL 1892527, at *9 (D. Minn. June 12, 2006).  Here, Plaintiffs have

10  failed to satisfy their burden.

## IV.   <u>ARGUMENT</u>

### A.   **The Overly Broad And Undefined Scope Of The Proposed Class Makes Clear, On Its Face, That Group-Wide Adjudication Of Plaintiffs' FLSA Claims Would Be Improper.**

#### 1.   **The Scope Of The Class Is Overly Broad.**

The deficiencies of the Motion are abundantly clear from the face of the Complaint and
Motion itself.  Plaintiffs seek to represent a collective group of "current and former employees of
[Carriage] who were suffered or permitted to work time for which they were not compensated,
including time for which premium pay was owed but not paid."  The lead Plaintiffs – all self-
described salaried Funeral Directors and/or Funeral Directors/Embalmers – make absolutely no
relevant distinction among themselves and the "hourly" employees they seek to certify as a
collective action, and whom they wish to solicit to join this case by way of a Court-approved
notice.  Even Plaintiffs acknowledge that they must demonstrate "a factual nexus between the

23  / / /

24  / / /

25  / / /

26  / / /

27

28

1   employees and the alleged polic[ies]" at issue.  See Plaintiffs' Memorandum, at p. 16.[5]  Here,

2   Plaintiffs have not done so, choosing to focus entirely on vague and undocumented "policies"

3   allegedly applicable to, at most, Funeral Directors.

4          Based solely on the putative opt-ins to date, it appears that Plaintiffs, as Funeral

5   Directors/Embalmers, ask to represent a class of employees that includes an extraordinarily broad

6   group, ranging from Training Specialists to Maintenance employees to Family Service

7   Representatives to Funeral Assistants and Apprentice Funeral Directors.  Beyond the putative opt-

8   ins, Plaintiffs' proposed collective action certification would include every other non-managerial

9   position at Carriage, including clerical and other support staff.  Moreover, it is irrefutable that

10  more than 50% of Carriage's workforce is employed on a part-time basis and, therefore, the

11  issues raised by Plaintiffs' Motion have little, if any, bearing on them (since such employees, by

12  definition, never work more than 35 hours per week).  See Section II(B)(1) for record citations.

13         Contrary to Plaintiff's premature assertions, Carriage's opposition to the certification

14  Motion is not premised just on the fact that putative collective action members work in different

15  locations or because they performed a "variety" of jobs.  See Plaintiffs' Memorandum, at p. 16.[6]

16  The problem is much more basic; if Plaintiffs' Motion were successful, this Court would assume

17  responsibility for the management of a case necessitating notice to more than 1,500 current

---

[5]   Plaintiffs contend that "the fact that notified employees may or may not ultimately be found to be similarly
situated make any difference at the notification stage."  That argument is undermined by the very cases they
cite.  See, e.g., Williams v. Trendwest Resorts, Inc., No. CVS05-0605, 2006 WL 3690686, at **4-5 (D.
Nev. 2006) (explaining that, at the notice stage, "The plaintiffs bear the burden of showing they are similarly
situated" and referring again to the need to demonstrate that the putative plaintiffs are "similarly situated").
Moreover, even to the extent courts recognize that, ultimately, a class may not be certified after the notice
stage, they still require some "factual nexus" between the allegations and the putative class members.
Plaintiffs, however, have failed to provide any such nexus between "all hourly employees" of Carriage and
the policies and practices the five lead Plaintiffs/Funeral Directors, who are all paid on a salary basis, have
identified.

[6]   Indeed, once again, the cases cited by Plaintiffs do not stand for the proposition for which Plaintiffs offer
them.  Contrary to Plaintiffs' assertions regarding the court's conclusions in Mershon v. Elastic Stop Nat.
Div. of Harvard Indus., No. 87-1319, 1990 WL 484152 (D.N.J. Mar. 23, 1990), that court did require that
the putative ADEA collective action members be employed "in the same corporate department, division, and
location," to advance similar claims of discrimination.  Mershon, at *6.  The court's decision in Heagney v.
European American Bank, 122 F.R.D. 125 (E.D.N.Y. 1988) is similarly misplaced, for in that case, the
"policy" at issue was a corporate-wide voluntary early retirement program that allegedly unlawfully targeted
and impacted older workers.  Because all putative class members received the same incentives and benefits
under the program, the fact of different locations was (unlike here) irrelevant to the similarly situated
analysis for the issues before the court.  Heagney, 122 F.R.D. at 127.

18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

16

1  employees, and at least 3,000 former employees without *any* evidence that any of these
2  employees are similarly situated in *any* relevant respect to the lead Plaintiffs, or that the majority
3  of these individuals could have any stake in this litigation.  That result is directly contrary to all
4  applicable precedent, and to the "efficient case management" purpose of the FLSA's notice and
5  conditional certification procedures.

6        In short, the scope and breadth of the proposed group to which notice would be sent *as*
7  *defined and described by* <u>*Plaintiffs*</u> demonstrate the fundamental deficiency of the Motion.  Given
8  the range of positions captured by Plaintiffs' proposed undefined group of "current and former
9  employees," it is impossible that Plaintiffs ever could satisfy the necessary "similarly situated"
10  standard even for conditional certification, and this Court should deny Plaintiffs' Motion for this
11  reason alone.

12          **2.**      **The Fundamental Flaw Of Plaintiffs' Motion Is Highlighted By The**
13                     **Fact That All Lead Plaintiffs Are Or Were Employed As Funeral**
                   **Directors – A Position That Is Largely Exempt From The FLSA's**
14                     **Overtime Provisions.**

15        The failure of Plaintiffs' Motion is particularly evident when one considers that all lead
Plaintiffs held only one position:  Funeral Director.  The Department of Labor and courts have
16
17  noted that, in most circumstances, that position is exempt from the FLSA's overtime
requirements.  As such, the FLSA issues raised in Plaintiff's Complaint and Motion are entirely
18
irrelevant to any of the lead Plaintiffs.
19
20        Specifically, the applicable regulations regarding "Learned Professionals" makes clear
that:
21
        [l]icensed funeral directors and embalmers who are licensed by and
22          working in a state that requires successful completion of four
        academic years of pre-professional and professional study,
23          including graduation from a college of mortuary science accredited
        by the American Board of Funeral Service Education, generally
24          meet the duties requirements for the learned professional
        exemption.

25  29 C.F.R. § 541.301.  Carriage recognizes that it will have further opportunity to vet the merits of
26  the lead Plaintiffs' individual claims.  That future opportunity notwithstanding, it is essential to
27  understand – prior to ruling on notice and conditional certification – that the lead Plaintiffs and
28  most of the putative collective opt-ins to date, are most likely exempt from the very laws they are

1    trying to enforce.

2         Perhaps anticipating this defense, the lead Plaintiffs tellingly failed to provide any

3    information regarding their educational background in their Declarations.  However, the

4    overwhelming majority of the Funeral Directors who submitted Declarations in support of

5    Carriage's Motion did.  In the Las Vegas location alone, Dave Julius is a licensed Funeral

6    Director who obtained a degree in Mortuary Science from Worsham College of Mortuary Science

7    in Wheeling, Illinois (Julius ¶ 2); George Herrera is a licensed Funeral Director who completed a

8    professional program in Mortuary Science at Cypress College (Herrera ¶ 3); and Shannon

9    Nordyke is a licensed Funeral Director who attended college and received a degree in Mortuary

10   Science from Carl Sandberg College (Nordyke ¶ 2.)  Virtually every other Funeral Director who

11   has submitted a Declaration in this case similarly is licensed and has completed a professional

12   course of study in the mortuary sciences.  See Dawson ¶ 2; Shaeffer ¶ 2; T. Sidun ¶ 9;

13   Thompson ¶ 2; Wilk ¶ 3; Young ¶ 4; see also Demrow ¶ 3; Diebold ¶ 3; Duhaime ¶ 2; Lang ¶ 2;

14   Tilton ¶ 6; Wolf ¶ 3; Woody ¶ 4 (all Managing Partners who also are licensed Funeral Directors

15   who completed professional courses of study in the mortuary sciences).  The qualifications of

16   these Las Vegas Funeral Directors alone highlight that there are real and significant issues

17   regarding the overbreadth of Plaintiffs' proposed class and, therefore, why Plaintiffs' proposal for

18   notice and conditional certification is reckless and overreaching.

19        Further, without regard to whether certain Funeral Directors satisfy the "Learned

20   Professional" exemption, the only two courts to have considered in publicly available opinions

21   whether licensed Funeral Directors are exempt have concluded that they are, in fact, exempt from

22   the FLSA's overtime requirements.  In 1998, the Seventh Circuit affirmed a district court's

23   conclusion that a licensed funeral director and embalmer was a professional, citing with approval

24   the district court's findings that the funeral director at issue "achieved the highest state license

25   level, was the only licensed funeral director and embalmer at the funeral home, was authorized to

26   and did conduct all aspects of the funeral business and was frequently solely in charge of the

27   funeral home due to his employer's absence."  See Szarnych v. Theis-Gorski Funeral Home, Inc.,

28   No. 97-3069, 1998 WL 382891, at *1 (7th Cir. June 4, 1998).  Two years after the Seventh

Circuit's decision, the Court of Appeals for the Sixth Circuit similarly affirmed a district court's conclusion that an employee who worked as funeral director and embalmer was exempt from the FLSA's overtime provisions.  In Rutlin v. Prime Succession, Inc., 220 F.3d 737 (6th Cir. 2000), the appellate court accepted the district court's findings that because the employee completed a specialized course of instruction – even though he did not obtain a bachelor's degree – he had the requisite "advanced, specialized knowledge" necessary for the exemption.  Rutlin, 220 F.3d at 743.  In addition, the court noted that the employee exercised the requisite independent judgment and discretion, citing duties such as "counseling grieving families, and removing, embalming and cosmetizing bodies . . . often unsupervised in those duties."  Id.

Once again, the decisions in Rutlin and Szarnych are not dispositive, but they are telling, particularly at this stage of the proceedings.  Even if Funeral Directors do not satisfy the strictest terms of the "Learned Professional" exemption, there is, at the very least, a strong argument that Carriage's Funeral Directors can satisfy the administrative exemption from the FLSA.  See 29 C.F.R. § 541.201-03 (explaining that employees must be paid on a salary basis, have primary non-manual duties related to the employer's business, and exercise independent judgment and discretion).  It is indisputable that Funeral Directors are paid on a salary basis and that their duties – arranging funeral services and, for some, embalming – directly relate to Carriage's business.  Further, all of the factors cited by the Seventh and Sixth Circuit Courts of Appeal as exercises of discretion, judgment, and professional duties – counseling grieving families, removing, embalming and cosmetizing bodies, and generally being in charge of the funeral home in the owner's absence – are all duties for which the Funeral Directors employed by Carriage are responsible.  Lang ¶ 5; Rose ¶ 11; Tilton ¶ 13; Gadziala ¶¶ 8, 10, 13; Hopkins ¶ 4; Thompson ¶ 7; Young ¶¶ 12-13.  As explained by a number of Managing Partners in their Declarations, it is an impossibility for Funeral Directors to do their jobs without the ultimate independence and discretion.  Demrow ¶ 8; Forastiere ¶ 21; Wolf ¶ 7.

In short, it is evident from the Declarations provided by Carriage in support of its opposition that there exist myriad individual issues to be resolved regarding the exempt status of Carriage's Funeral Directors – the very position Plaintiffs are trying to use to bootstrap an

unwieldy collective action. As such, this Court should recognize the instant Motion for what it really is: an effort by a miniscule group of disgruntled Funeral Directors, who are likely exempt from the FLSA, to use a nationwide platform to vet their personal grievances against their current and former employer.

**B.     Given Carriage's Decentralized Business Model And Philosophy, The Issues Raised Are Too Individualized For Group-Wide Adjudication.**

Even if everything that Plaintiffs say in their declarations is accepted as true, those assertions could establish FLSA violations only as to *those* employees in *those* locations.[7] Their "facts" tell, at best, only part of the story, and they make gross generalizations from incomplete information. They now ask the Court to make a highly tenuous leap of faith that because there allegedly were issues with a policy at *their* location with regard to decisions made by *their* specific Managing Partners, then there must be issues at the more than 170 other locations with the approximately 75 other Managing Partners as well. Such speculation and conjecture do not suffice to meet Plaintiffs' burden for conditional certification, particularly when viewed against the irrefutable and contrary evidence grounded in personal knowledge proffered by Carriage.

To gain conditional certification of a collective action under the FLSA, Plaintiffs must demonstrate that "the putative class members were together the victims of a **single decision, policy, or plan**." Gerlach v. Wells Fargo & Co., No. C05-0585, 2006 WL 824652, at *2 (N.D. Cal. Mar. 28, 2006) (emphasis added); accord Thiessen v. GE, 267 F.3d 1095, 1102 (10th Cir. 2001); Scholtisek v. Eldre Corp., 229 F.R.D. 381, 387 (W.D.N.Y. 2005) (noting that courts require plaintiffs at the notice stage to make "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan"). As it is their burden to convince the Court that the employees whom Plaintiffs seek to provide notice are similarly situated, Plaintiffs must do so for all of the different locations at which employees work. See, e.g., Horne v. United Serv. Auto. Ass'n, 279 F. Supp.2d 1231, 1235 (M.D. Ala. 2003) (finding

---

[7]   To the extent Plaintiffs make conclusory assertions regarding matters of which they have no personal knowledge, those allegations should not be considered. See, e.g., Declaration of Douglas Brown, at ¶ 12 ("Carriage too had a company-wide policy requiring hourly employees, such as myself to actively participate in at least one outside community organization and as a means to increase the Company's business.").

1   that "a plaintiff must demonstrate that employees outside of the work location for which the

2   plaintiff has provided evidence were similarly affected by alleged work policies in order for the

3   court to certify a collective action which extends beyond the plaintiff's own work location").

4   Here, Plaintiffs' efforts to create company-wide time-recording policies when none actually exist

5   and to create company-wide guaranteed bonuses when the only bonuses actually are, at best,

6   offered on a discretionary, location-by-location or person-by-person basis cannot satisfy those

7   burdens.  Rather, it is clear that the decentralization and independent operations of Carriage's

8   locations do not permit any finding of a "single decision, policy, or plan" that implicates any of

9   the issues raised by Plaintiffs' Motion.

> **1.**    **"Off-the-clock" allegations such as those at issue are not appropriate for group-wide adjudication.**

12   Courts repeatedly have recognized that "where an 'off-the-clock' claim requires

13   significant individual considerations, it may be inappropriate for conditional certification." Ray

14   v. Motel 6 Operating Ltd. Partnership, 1996 WL 938231, *4 (D. Minn. Mar. 18, 1996) (denying

15   motion for notice to class because plaintiffs worked at a minimum of 39 different properties,

16   located in 20 different states; the properties where the plaintiffs worked varied widely as to the

17   number of rooms and budgets; and the amount of overtime hours varied among plaintiffs, as such

18   the off-the-clock issues were too individualized for collective action adjudication); see also Diaz

19   v. Electronics Boutique, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. 2005) (concluding that

20   allegations regarding off-the-clock work and altered time records "are too individualized to

21   warrant collective action treatment"); Lawrence v. City of Philadelphia, 03-CV-4009, 2004 WL

22   945139, at *2 (E.D. Pa. Apr. 29, 2004) (denying motion for class certification in "off-the-clock"

23   case because "[t]he circumstances of [the] individual claims potentially var[ied] too widely to

24   conclude that. . . the Plaintiffs [were] similarly situated" to those they sought to represent);

25   Sheffield v. Orius Corp., 211 F.R.D. 411, 413 (D. Or. 2002) (declining to certify off-the-clock

26   class action where affidavits submitted "suggest that each claim would require extensive

27   consideration of individualized issues of liability and damages").

28   In the above-cited West v. Border Foods, Inc., 2006 WL 1892527, the Court found that, as

1   here, individual issues predominated and conditional certification was improper in an "off-the-

2   clock" case when the plaintiffs "were employed at different [ ] locations, where different

3   individual [ ] managers allegedly used varying means to deprive the Plaintiffs of proper

4   compensation for his or her (sic) overtime hours." Id. at *9.   See also England v. New Century

5   Fin. Corp., 370 F. Supp.2d 504, 509 (M.D. La. 2005) (finding conditional certification improper

6   in an "off-the-clock" claim involving a multitude of different managers at different locations, and

7   where liability at one location would not necessarily require a finding of liability at another

8   location); Cornn v. United Parcel Serv., Inc., No. C03-2001 TEH, 2005 WL 2072091, at *2-6

9   (N.D. Cal. Aug. 25,

10   2005) (denying class certification where plaintiffs alleged off-the-clock work, but failed to

11   present evidence that there was a common policy as to what employees did during that time, how

12   long it took, and whether they did so consistently); Basco v. Wal-Mart Stores, Inc., No. 00-3184,

13   2004 WL 1497709, at *7 (E.D. La. July 2, 2004) (finding that where defendant had official policy

14   requiring payment for all working time, and where defendant asserted that deviations from that

15   policy occurred "on a manager-by-manger and associate-by-associate basis involving particular

16   circumstances and anecdotal testimony," plaintiffs had failed "to demonstrate identifiable facts or

17   legal nexus that [bound] the claims so that hearing the cases together [would promote] judicial

18   efficiency").

19           Although Plaintiffs Declarations and Memorandum suggest a number of purported

20   "centralized" policies that preclude employees from being compensated for all time worked, there

21   is absolutely no evidence of any such policies.[8]  As set forth above, no Managing Partner or

22   Funeral Director who submitted declarations under oath in opposition to Plaintiffs' Motion was

23   aware of any off-the-clock policy, particularly with respect to "community service," "on-call

24

25   [8]   The fact that Carriage includes "Community Service" as one of the subjective evaluation components in its
       performance evaluations is irrelevant to this analysis.  To suggest that a subjective evaluative factor
26      constitutes a "policy" and, therefore, that time spent on that factor becomes compensable time would turn
       the distinction between work and personal time on its head.  By way of just one example, "Attitude" is a
27      similarly subjective factor that is included in performance evaluations, and, if it should be considered a
       company "policy" for which time is compensable, there would be no reason not to require employers to
28      compensate employees for all time spent getting into a proper frame of mind for work.  Such a result is
       patently absurd.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

1   time," or "pre-need appointments." See Section II.B.3 for record citations.  To the contrary, each

2   Funeral Director – including those in the locations at which the lead Plaintiffs are or were

3   employed – confirmed that they have been instructed at all times to ensure that all time worked –

4   for whatever reason – is recorded. See Hopkins ¶¶ 7-10 (Las Vegas Funeral Director, denying

5   knowledge of any policy by which he would not be compensated for time worked, explaining

6   ways he is encouraged to ensure that all time worked is accurately recorded, and confirming that

7   he has never had a problem receiving compensation for all time worked); Julius ¶¶ 8-14 (Las

8   Vegas Funeral Director, same); Herrera ¶ 10 (Las Vegas Funeral Director, confirming that he

9   "never ha[s] been asked to perform any work for which I have not been fully compensated" and

10  explaining that "[i]t is not the culture [in Las Vegas] to ask employees to 'work off the clock'");

11  Nordyke ¶¶ 7-9 (Las Vegas Funeral Director, confirming all the same); Gadziala ¶ 15

12  (Springfield Funeral Director, confirming the same); Magdycz ¶¶ 7-8 (Springfield Funeral

13  Director, confirming same; Kastner ¶¶ 9-10 (same).  Similarly, each Managing Partner has

14  instituted mechanisms by which to ensure that all time worked is recorded and compensated. See

15  Section II(B)(3) for record citations.

16      At most, all that is before the Court are the alleged experiences of five individual Funeral

17  Directors.  In contrast, Carriage has demonstrated how Funeral Directors in those same locations

18  as well as Funeral Directors employed in nearly 170 other locations had vastly different

19  experiences with respect to community service, on-call work, pre-need appointments, and

20  compensation for time worked. See Section II.B.3 for record citations.  In short, Plaintiff's paltry

21  and unsubstantiated allegations of "company-wide" issues should be insufficient as a matter of

22  law to warrant notice as to their respective states alone, and certainly should be insufficient to

23  warrant notice nationwide.

24          **2.      As with the "off-the-clock" allegations, the individualized and
            discretionary nature of the incentive bonuses preclude notice and
25          conditional certification regarding Plaintiffs' allegations that Carriage
            improperly calculated the regular rate of pay.**

26      For all of the reasons set forth above with respect to "off-the-clock" allegations, the claims

27  relating to individual discretionary incentive bonuses – including the "flower bonuses" only

28

1   certain of the lead Plaintiffs ever received – should not be subject to notice and conditional

2   certification.  These incentives, for those locations that had incentive compensation at all, were

3   established exclusively on a Managing Partner-by-Managing Partner basis.  As a result, neither

4   nationwide notice nor conditional certification would be appropriate.  Once again, the "similarly

5   situated" standard applies – and none exists here.  Carriage, as a company, sponsors only one

6   discretionary bonus program for its Funeral Directors only.  To the extent discretionary bonuses

7   exist, they are determined on a local-level by individual Managing Partners, and, in some

8   instances, are determined between the Funeral Directors and outside third-party vendors.  See

9   Section II.B.3 for record citations.

10          Further, to the extent individual Managing Partners decided to establish individual

11  incentive bonuses, Plaintiffs have failed to offer sufficient information to the Court demonstrating

12  why their individual issues should be adjudicated on a class-wide basis.  In addition, in order to

13  determine whether a discretionary bonus should have been included in calculating the regular rate

14  of pay for overtime purposes, the Court must determine, at the least:  (1) whether the individual

15  who received the bonus is exempt (i.e., Funeral Directors); (2) whether the bonus was

16  discretionary, such that it need not be included in any calculation for overtime purposes (29

17  U.S.C. § 207(e)(3); 29 C.F.R. § 778.211); and (3) whether, for each workweek, overtime hours

18  needed to be calculated for each individual employee.  Each of those inquiries, on its face,

19  necessarily is an individualized, fact-specific inquiry.

20          Moreover, the fundamental flaw of this case – that the class is so overly broad – further

21  highlights why this issue specifically is not appropriate for group-wide adjudication, even for

22  those few Funeral Directors that might be determined to be non-exempt.  First, of the

23  approximately 1,700 current employees, 904 – more than 50% of the *entire* Carriage population

24  (including managers who could not be part of this putative collective action) – are employed on a

25  part-time basis.  Thus, the regular rate for overtime simply does not apply more than 50% of the

26  putative class to which Plaintiffs are asking to send notice.  Moreover, as set forth above in

27  Section IV.(B)(3), to the extent positions such as Funeral Directors, or other positions, for that

28  matter, are considered exempt from overtime, the regular rate also is of no consequence to those

1  additional putative collective action members.  Accordingly, whether an individual incentive

2  bonus even should, as a matter of law, be required to be included in the calculation of the regular

3  rate of pay, necessarily will require a location-by-location analysis that is antithetical to the

4  "similarly situated" standard required for notice and conditional certification.

5  **V.   CONCLUSION**

6       Plaintiffs' Motion does more than put the quintessential cart before the quintessential

7  horse.  Rather, Plaintiffs' Motion dispenses entirely with the quintessential horse. It ignores

8  entirely the fundamental requirement that the plaintiff carry the burden of demonstrating that the

9  putative class under the FLSA be "similarly situated" (or, in Plaintiffs' words, bear some "factual

10 nexus") in any meaningful or relevant way.  Plaintiffs do not even come close to satisfying the

11 evidentiary burden necessary to have their Motion granted.  But if there were any doubt, the

12 evidence submitted by Carriage in opposition to Plaintiff's Motion conclusively shows that

13 Plaintiffs are not similarly situated to other employees in the proposed nationwide class.  That a

14 Funeral Director in Las Vegas, Nevada, alleges that he has been directed to work without

15 recording time or that the bonus his manager once provided was not included in his regular rate of

16 pay means absolutely nothing with regard to how employees in Danville, Kentucky, or Bristol,

17 Connecticut, or Rockingham, North Carolina, have been treated.  Those allegations mean even

18 less to a Training Specialist or Maintenance employee.  Therefore, for all of the reasons set forth

19 / / /

20

21 / / /

22

23 / / /

24

25 / / /

26

27 / / /

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

1    above, Carriage Services, Inc. respectfully submits that Plaintiffs' Motion for Collective Action

2    Notification should be denied in its entirety.

3

4    Dated: January 28, 2008

5                                          _____/s/_____

     MORGAN, LEWIS & BOCKIUS LLP
6    Michael L. Banks, *(Pro Hac Vice Forthcoming)*
     Sarah E. Bouchard, *(Pro Hac Vice Forthcoming)*
7    1701 Market Street
     Philadelphia, PA 19103-2921
8    Tel:  215.963.5000
     Fax:  215.963.5001
9    E-mail:  mbanks@morganlewis.com
     E-mail:  sbouchard@morganlewis.com
10
     LITTLER MENDELSON, P.C.
11   Rick D. Roskelley, Bar No. 3192
     3960 Howard Hughes Parkway, Suite 300
12   Las Vegas, Nevada  89169-5937
     Tel:  702.862.8800
13   Fax:  702.862.8811
     E-mail:  rroskelley@littler.com
14   Attorneys for Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is 3960 Howard Hughes Parkway, Suite 300, Las Vegas, Nevada 89109. On January 28, 2008, I served the within documents:

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO MOTION FOR COLLECTIVE ACTION NOTIFICATION**

 By placing a true copy of the documents listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States Mail at Las Vegas, Nevada as set forth below and by CMF/ECF>

Dolin, Thomas & Solomon, LLP
693 East Avenue
Rochester, NY 14007

Leon Greenberg
633 South Fourth Street, #9
Las Vegas, Nevada 89101
Attorneys for Plaintiff

I am readily familiar with the firm's practice of collection and processing correspondence for mailing and for shipping via overnight delivery service. Under that practice, it would be deposited with the U.S. Postal Service or if an overnight delivery service shipment, deposited in an overnight delivery service pick-up box or office on the same day with postage or fees thereon fully prepaid in the ordinary course of business. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of January 2008 at Las Vegas, Nevada.

*Renee M. Williams*
Renee M. Williams

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

27